**In re JW ALUMINUM COMPANY, Debtor.**

**Bankruptcy No. 89–9718–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

July 25, 1996.

Don M. Stichter, Tampa, Florida and Michael Crames, New York City, for Debtor.

Terrance A. Bostic and Patricia Levy Ritsch, Tampa, Florida, for Philipp Brothers, Inc.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION ON DEBTOR'S OBJECTION TO CLAIM NUMBER 208 OF PHILIPP BROTHERS, INC.

ALEXANDER L. PASKAY, Chief Judge.

This is a confirmed Chapter 11 case and the matter under consideration is the Debtor's, J.W. Aluminum Company's (Debtor), Objection to Claim Number 208 filed by Philipp Brothers, Inc. (PBI) in the amount of $1,683,156. The Claim is based on damages

allegedly suffered by PBI as a result of the Debtor's breach of aluminum supply contracts. It is the Debtor's contention that it is not liable for damages in any amount because the contracts under consideration were repudiated by PBI who committed an anticipatory breach prior to the Debtor's rejection of the contracts. For this reason, the Debtor claims PBI does not have an allowable claim.

Having considered the record established at the Final Evidentiary Hearing and the post-trial briefs submitted by the parties, this Court now finds and concludes as follows: At the time relevant, the Debtor was and still is in the business of selling raw and processed aluminum and operates a manufacturing facility with an annual capacity of eighty million pounds of rolled aluminum coil and foil. Prior to the Petition date, the Debtor was engaged in efforts to expand its annual capacity to one hundred ten million pounds and, in that regard, entered into a number of contracts with aluminum suppliers, including some by which PBI would sell the Debtor aluminum over three- to twelve-month periods during 1989. The fourteen contracts were either fixed purchase price orders or variable purchase price orders (min-max contracts), the latter of which are not relevant to these proceedings. The eight separate fixed price contracts at issue here are as follows:

| CONTRACT | PRICE | P.O. No. | SHIPPING INSTRUCTIONS |
|---|---|---|---|
| 122628 | $.895/lb. | # 8020 | 551,150 lbs/mo. (1/89–12/89) |
| 122717 | .935/lb. | # 8447 | 551,150 lbs/mo. (10/89–12/89) |
| 122754 | .965/lb. | # 8514 | 220,460 lbs./mo. (4/89–12/89) |
| 122761 | 1.010/lb. | # 8520 | 600,000 lbs/mo. (1/89–12/89) |
| 122864 | .9025/lb. | # 8905 | 2,220,460 lbs/mo. (10/89–12/89) |
| 122852 | .9325/lb. | # 8901 | 2,204,300 lbs/mo. (7/89–12/89) |
| 122883 | .8575/lb. | # 8919 | 1,102,300 lbs/mo. (7/89–12/89) |
| 122894 | .8575/lb. | # 8921 | 1,102,300 lbs/mo. (7/89–12/89) |

The contracts did not specify the shipping destinations or the release dates, but rather, they anticipated the issuance of shipping releases which would include that necessary information.

In addition to its own direct sales, the Debtor also acted as a broker for another company and earned the difference between the fixed purchase price from PBI and the sales price to the other company as a commission. In a strong aluminum market, such as what occurred in early 1989, the Debtor's customers generally entered into forward order contracts in which the quantity and price was agreed upon in advance and which provided for periodic shipments throughout the term. The Debtor would, in turn, enter into long-term purchase contracts with suppliers, such as those with PBI, in order to be able to produce the amount of aluminum products ordered. Pursuant to the long-term contracts, PBI made monthly shipments to the Debtor of some $1,250,000 worth of aluminum. The contracts provided for payment terms of net cash within thirty days of shipment.

On Dec 21, 1989, the Debtor was already indebted to PBI in the amount of $3,174,740 for aluminum PBI delivered for the period from November 22, 1989, thru December 15, 1989. By mid-December, PBI became aware that the Debtor and its subsidiaries might be in financial difficulties and because of widespread rumors of potential Chapter 11 filings, PBI became apprehensive that if it delivered any further aluminum it might not get paid. In order to assure that the Debtor would honor its obligations under the contracts, PBI wrote a letter dated December 21, 1989, (PBI'S Ex. 13) to the Debtor requesting that the Debtor provide adequate assurances of future performances pursuant to section 2–609 of the Uniform Commercial Code as adopted by section 672.609 of the Florida Statutes, such as posting a letter of credit, making cash payments in advance, or shipping on a COD basis.

Although the Debtor did not respond to the December 21, 1989, letter in writing, the Vice President for Marketing and Sales of the Debtor telephonically advised PBI that the Debtor would not make payment on invoices already submitted in the amount of $1,900,000, which pursuant to the terms of the invoice became due the following day, until after Jan 1, 1990, and only then if the Debtor did not file a Chapter 11 Petition. As a matter of fact, the Debtor, the Debtor's parent and its affiliates filed Petitions for Relief in this Court under Chapter 11 on Dec. 28, 1989. It is not seriously disputed that the Debtor post-petition did not request that PBI ship aluminum pursuant to the contracts involved in this controversy, but merely requested shipment under some 1990 contracts (colloquially referred to as the min-

max contracts which are not included in Claim No. 208 filed by PBI).

Shortly after commencement of the case, the Debtor and PBI engaged in a flurry of correspondence. None of these correspondence or communication efforts indicated that the Debtor was willing and able to furnish adequate assurances of payment; rather, the Debtor merely assured PBI that any postpetition shipments by PBI would be afforded cost of administration status pursuant to § 503(b) and, in turn, priority pursuant to § 507(a) of the Bankruptcy Code.

Robert Kiken, the number two person in PBI's aluminum department, and the author of the letter requesting adequate assurances, wrote the Debtor on January 4, 1990, and expressed grave concerns about the vagueness of the Debtor's statements that the postpetition obligations, if PBI resumed shipments, would be paid as administrative expenses, rather than according to the terms of the contract. PBI was well aware that the HHC bankruptcy cases could be pending for a considerable time before confirmation could be achieved and it was concerned that its post-petition receivables would be paid pursuant to an approved Plan. Kiken stated that the Debtor could move to assume the contracts pursuant to § 365 of the Bankruptcy Code.

The Debtor responded by letter dated January 5, 1990, reiterating its prior position and referencing this Court's Order Authorizing the Debtors-in-Possession to Continue to do Business (DIP Order) which allowed the Debtors to pay all necessary and current expenses of the operation of the business, limited to the satisfaction of obligations incurred by the Debtors post-petition. Attached to the Debtor's letter was a letter from its attorney restating the Debtor's position that PBI would be afforded priority status.

Representatives of the Debtor and PBI met on January 26, 1990. The Debtor provided verbal assurances of its financial strength and urged PBI to continue its business relationship with the Debtor. Following that meeting, PBI faxed the Debtor a letter outlining terms under which it would feel secure in continuing its relationship with the Debtor and specifically referencing two contracts under which the Debtor had requested release of aluminum; namely, PBI would ship up to $1,000,000 in metal outstanding at any time; the payment terms would be net 30 days; and invoices paid within five days would be subject to a 1% discount. Three days later, Wilson wrote to inform PBI that the Debtor was in the process of "developing an appropriate response" to PBI's offer and that he would respond the following day. At that time, Wilson wrote to indicate that the Debtor and its attorneys were considering the offer and would respond during the week of February 11, 1990.

Kiken responded to the Debtor's letter the following day, and expressed his dismay that a decision on the offer had been postponed until that February date. Ultimately, in mid-February, the Debtor met with PBI representatives and expressed its desire to resume a positive commercial relationship, but that it was compelled to reject the above market rate contracts. The Debtor suggested that PBI file a claim for any damages resulting from the rejection.

PBI's contract rejection claim, Number 208, in the amount of $1,683,156, is calculated pursuant to section 2–708(1) of the U.C.C., adopted in Florida as section 672.708, Florida Statutes (1992), and represents the repudiation damages based upon the difference between the contract price and the market price at the time and place of tender. The claim is based on the undisputed fact that 9,260,771 pounds of aluminum remained unshipped. Because the contracts did not reference a specific shipping date, PBI utilized the average of the daily market rates published in *Metals Week* for the five weeks following its demand for adequate assurances. Thus, PBI claims the average market value for that period was $.7128022 per pound. In its Objection to the Claim the Debtor raised no objections to the calculations used in defining the market rate; rather, its objections were based on the contention that PBI failed to present evidence of loss.

## OBJECTION TO PBI'S CLAIM

Based on the following facts, the ultimate question which requires resolution is whether

the contracts under consideration were repudiated by PBI, who was thus guilty of anticipatory breach or whether these contracts were breached by the Debtor, and, thus, PBI is entitled to its Claim as allowed in the undisputed amount of $1,683,156.

It cannot be gainsaid that the Claim, as filed, was an unliquidated and a contingent claim, thus pursuant to § 502(c), a liquidation was required. In the present instance, the amount is now liquidated in the sense that the Debtor concedes that if PBI's claim is allowed, the amount of the claim is proper and the claim should be allowed in the amount as filed.

The transaction between the parties is obviously governed by the Article of Sales of the UCC, particularly 2–609, as adopted in this State by section 672.609, Florida Statutes (1992) which provides:

### RIGHT TO ADEQUATE ASSURANCE OF PERFORMANCE

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise . . . [a party] may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

This Court is satisfied and there is no question that under the circumstances presented PBI was entitled to demand adequate assurance of payment.

The Debtor was not justified in treating the transaction as it did by relying on the fact that it was authorized to do business post-petition, and thus whatever debts it incurred would be entitled to administrative claim status. This statement was imprecise, and in one sense incorrect, in that the DIP Order required the Debtor to promptly pay all current operating expenses; thus, under this provision it was required to do more than recognize an administrative claim status for the shipments it would have received post-petition, specifically by prompt payment, even to receive these shipments on a COD basis.

Anyone who is remotely familiar with Chapter 11 cases and the Debtor-in-Possession post-commencement status frequently is painfully aware that the recognition of a postpetition claim as a cost of administration is a phyrric victory, if a victory at all. It is a well-know fact that the mortality rate in Chapter 11 cases is quite high and in an aborted Chapter 11 case, which is later converted to a Chapter 7 case, the cost of administrative items incurred in the Chapter 11 case are subordinated to the costs of administration items incurred in the liquidation phase of the case.

Based on the foregoing it is clear that PBI was justified, first, in its apprehension and was right to demand adequate assurance of payment before it shipped, and second, the Debtor was clearly dilatory in deciding whether to assume or reject these executory contracts, ostensibly waiting to determine the change in the market price. This being the case, this Court is satisfied that these contracts were breached by the Debtor and that the rejection damages asserted in Claim Number 208 are proper and should be allowed. Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Claim Number 208 filed by Philipp Brothers, Inc. be, and the same is, hereby allowed in the amount filed as a general unsecured claim. It is further

ORDERED, ADJUDGED AND DECREED that the Debtor's Objection to Claim Number 208 be and the same is hereby overruled. A separate Final Judgment

will be entered in accordance with this Memorandum Opinion.